My name is Daniel Mason and I represent Eller Media, Appellant and Cross-Appellee. With the Court's permission, I'd like to reserve five minutes. And if it is acceptable, Your Honors, I'd like to address all our issues, both the Appellant side and the Appellee side. That's probably the most efficient, so why don't you just proceed with your argument. I'll try to help you save five. You keep your eye on the clock, too. Thank you, Your Honors. First, I'd like to address the unfair competition claim. This is with respect to the District Court's denial of the JMOL and the ultimate judgment of $800,000 on unfair competition against Eller. First, Your Honor, let me... You said this very clearly, and I apologize. You're representing CITY SOLUTIONS. No, Your Honor. I represent Eller, the Cross-Appellant and Cross-Appellee. You're on the CLEAR CHANNEL side, then. Yes. The names are reversed here. Yes. CLEAR CHANNEL, Your Honor, was dismissed from the case, undirected verdict, and no longer parties. You're on the Eller side. Okay. I'm sorry. Thank you, Your Honor. With respect to the unfair competition claim, this is the claim that the judge did not set aside from the verdict, and therefore, there's an $800,000 judgment from which an appeal was taken. Yes. With respect to the unfair competition claim, let me first start out with the elements of unfair competition that I think are very important here, and I don't think there's much of a dispute about it. First, Your Honor, the party must show substantial time and expense and money developed in this property. Secondly, they must show that it was taken, misappropriated by the defendant without any ‑‑ with little or no money, and thirdly, injury. There has to show an injury. I don't think any of those points were met as a matter of law here. First, Your Honor, CITY SOLUTIONS is a new company. It was formed for this matter, for this project. They have no history. They weren't around very long. There is nothing in the record whatever to demonstrate that CITY SOLUTIONS expended substantial time and substantial money on developing this property. Now, what is the property? There was some dispute about that at trial. It turns out that the property they're talking about, I put property in quotes, is the fact that 500 ad facings would appear on the back of these module and use rec. That is, 500 ad facings would appear, and the fact that in the bid, they said there would be no revenue sharing with the city. They claim these two aspects are the property, but to show that, Your Honor, they'd have to show that they put in a lot of time and money in developing this, and they haven't showed it. This is not the formula for Coke or why Rice Krispie, Snack Crackle, and Pop. We believe, Your Honor, that the record is devoid of anything that shows the first element of unfair competition, substantial time and substantial money in developing this. There were discussions among the parties about whether there should be 500 or 400 or 300 facings in the back of these modular units. But there was not a substantial, there was no time and money, I would submit, in developing the so-called property. And the fact that they decided not to share revenue with the city, they also cannot show, and there's nothing in the record that shows that they devoted any substantial time or money to developing that. With regard to the misappropriation, the record shows, Your Honor, and it was conceded by Mr. Trento, that Atchell, and keep in mind, Eller did not bid here. It was Atchell, the sister company who made the bid. And here's what the President said, this is the President of CSI, I know for a fact that extensive research, development, and design has gone into Atchell's modular news rack program. Conceding on this very point that Eller slash Atchell put in a lot of time and money. So there's hardly anything in the record that shows that this was even misappropriated from them. And finally, Your Honor, with respect to the injury, counsel did not argue any damages arising that makes any reference at all to how the $800,000 figure came about. Indeed, you have to look at Judge Alsup's analysis of this. And Judge Alsup, in denying the motion, made the following statement. And this is the reported opinion, it's in F-Sub 3rd, and the court has a citation. Judge Alsup said, well, the jury may have awarded damages, may, for, quote, worry. For, quote, worry. The problem with that analysis is the counsel conceded in closing argument. And indeed, it was never argued that this is any sort of emotional distress case. Counsel never asked for damages for, quote, worry. There's nothing in the record to support damages for worry. They never put on any testimony showing that there should be $1, let alone $800,000 for worry. And so Judge Alsup's opinion, it's at the end of his opinion when he says, well, the jury may have awarded, quote, worry damages. Your Honor, it makes no sense on this record, and it is inconsistent, contrary, if you will, to what counsel for CSI argued in closing argument. He said this is not an emotional distress case. And Judge Alsup said, well, maybe, may, they could have, quote, gone to school on what CSI brought to the table. But again, Your Honor, there's no evidence to support any sum of $800,000 in regard to going to school. And in fact, the record shows that CSI had just started a brand new company. Atchell, who made the bid, had extensive experience in this. They had a lady by the name of Kathy Kahn, who developed this, their bid and all the projects. So there's nothing to support the, quote, going to school. Keep in mind, Judge Alsup made it clear that the $800,000 he allowed to stand was not based on lost profits, not based on lost profits. It was based on what the district court conceived of as compensation for this worry and compensation for going to school. But the record, I submit, is devoid of anything. This sounds like an odd form of commercial and potential infliction of emotional distress. Yeah, $800,000 worth of emotional distress worry. That must have really worried these guys. Yes, but the point, Judge Fletcher, is the counsel disavowed claiming any worry. He disavowed that there was anything about emotional distress in the case. He argued that that was not part of his argument. And he affirmatively said, because I had an objection in closing argument on this. He affirmatively says that we're not asking for emotional distress. We're not asking for worry. It was never pled. It was never proven. And God knows where this $800,000 number came out of the air. So we think it's very clear, Your Honor, that there's nothing in the record to support any. Well, here's where it might have come from. Although this is not something that seems easily to fit within Judge Allsup's written opinion. I'm quite willing to go along with Judge Allsup in saying that during the negotiations and dealings that you had with the other side, you guys discussed bidding strategy and how this was going to work and what you were going to do. And to that extent, there was some property in terms of the ideas that they would have had. You then take those ideas and use them to put your own bid together. That sounds like unfair competition. But then the question is damages. Yes. Assume you've done that. That's damages. I find his conclusion that there are $800,000 worth of damages, if I don't say that worry is compensable, I find it absolutely inconsistent with his setting aside the $900,000, no, $9 million verdict. That is to say, because he says, listen, these guys were never going to win the bid, period, ever. So I think, in my view, you're going to get zero or you're going to get $9,800,000 against you. You want to go settle this case in the hallway? Well, Your Honor, we certainly will take it. Do you follow my analysis? I do, but I understand exactly, Your Honor, what you're saying. But if you look at Judge Alsop's opinion, he is attributing the $800,000 not to lost profits. He concedes they can't get that, and I'll get to that in a moment. He attributes it to this worry damage. And what we're saying here is there's nothing in the record to support any such number. There's nothing in the record to support any judgment on, quote, worry because it was never pled. There's nothing to support that they went to school and, therefore, there was some damage or injury of $800,000. Yeah, but we can affirm on any ground. I don't have to agree with worry to affirm his $800,000 verdict. You can affirm on a ground that it has to be supported in the record, Your Honor. I understand that. And I agree with the comment. But what I'm saying is there's nothing in this record to support that sum. It was never argued. It was never pled. It was disavowed by counsel. And there's a second aspect to this also, Your Honor. And that is, we believe, this whole concept of this government discretion cases that we cited in our brief. And this goes to causation also. Even if you assume there was some lost profits, the cases are very clear. And there's five of them, Your Honors. There's two California Supreme Court cases, Kojima and Blank v. Kerwin. There's a court of claims case, Kiko, to the Court of Appeals of New York, Goodstein v. United States. And there's a Ninth Circuit case written by Judge Weigel when he was sitting by designation, which is in the alternative holding in the Savini case. And the teaching of these cases is that when you are making a bid to get a government contract, whether it's a municipal or federal, and there is discretion by the municipalities or the government as far as whether they can award the contract or reject it or decide that they're going to set it aside or decide they're going to go to the second or third bid, when you have that sort of discretion, there can never be lost profits recovered. There can be bidding or there can be damages for the cost of the bid, out-of-pocket costs, yes. But there can't be any lost profits recovered because of that. Because the courts have said, all these five cases have said consistently that it's too speculative. You don't know if the municipality would have awarded this. There's too much going on within the government. Every one of these cases that I cited, and they're all in our brief, make that point very clearly. And in this case, the party, Mr. Trento, conceded, what do you get if you won this bid? It guarantees you nothing. That's what he said. I don't understand. It guarantees you nothing. Here's my problem. And I guess this is a problem for the other side as well as for you. Because for me, the more I think about this as a you win everything or you lose everything case, for the $9 million verdict, Judge Alsop has said there is no way that City Solutions was going to win this bid. Without you, they weren't going to get it. That is correct. And he said they weren't going to get it. Your Honor, if you disagree with him on that, if I disagree with him on that, if I look at the evidence and I think there's enough evidence in there from which the jury could conclude that, indeed, they might have won it, and that he's wrong to give a JMOL or, in the old terminology, JNOV, well, then, bingo, you're out not only $800,000, but you're out $9 million. Well, Your Honor, and I don't want to go settle this in the hall. Well, Your Honor, right now, I think I'd like to argue the appeal. I shouldn't tease you. I would like to also, if I can address the contract claim. Summary judgment was granted on the contract claim. And the judge wrote an opinion, and in that opinion, he distinguished CCT. But something happened that's very interesting here. At the trial of this case, Mr. Trento, who was the president of CSI, conceded there was no, quote, gigantic contract. Didn't have a gun to their head. They could leave whenever they want. Now, he said that as of May 26th. And so, I think it is very disingenuous, because in our brief, we say why CCT was properly distinguished and so forth. But I submit that this Court could take what Mr. Trento said. He conceded there was no contract. How can they argue to the Court of Appeals, reverse the summary judgment that the judge said there was no issue effective to the contract when at trial? When at trial, the party asserting this claim, the president of the company, said we had no contract. He concedes that. So I find it respectfully disingenuous for an appellant to argue, having had this client concede at the trial of this matter that there was no contract, that summary judgment granted to that effect ought to be reversed. There are other reasons also, Your Honor, for reversing the question of contract. This case, this Court decided the CCT case. And I know counsel relies upon that, and Judge Alstub dealt with that opinion. Is that case binding on us? Well, it's certainly law of the Ninth Circuit, but it's distinguishable. Aren't we under Erie required to look at California law as to whether there was an oral joint venture agreement? Well, yes. But the California law is very clear. There has to be a meeting of the minds. They have to agree on most of the main issues. And was Judge Noonan purporting to follow California law in CCT? Judge Alstub? Was Judge Noonan in CCT purporting to follow California law? I think he did. Yes. Whether he did or not, that's what he thought he was doing. I think he did do that. And I know Your Honor was on that panel. Yeah, yeah. He did that. I've done a lot of bad things in my life. Okay. As to CCT, Your Honors, I think this is important to keep in mind. First of all, in CCT, the record was they had a meeting of the minds. They had agreed to all points. In this case, as Judge Alstub says, and he takes it from the First Amendment verified complaint, the agreement was subject to working out the details. They hadn't agreed on everything. They hadn't agreed on who would own what. They hadn't agreed on what would happen in terms of what would be the cause of termination. It's distinguished on that grounds. In CCT, you had this Woodruff affidavit, the smoking gun affidavit, where the employee of CCT basically gave an affidavit and said, hey, I feel so bad about what happened here. We really lied to these guys. And there was an agreement. And I'm giving this affidavit. And I'll probably get fired. There's no such thing in this case. There's no such thing in this case. CCT was a case involving defense contractors. And it was a teaming agreement. And a teaming agreement is specifically defined in the Court of Federal Regulation. Counsel, I want you to comment on the Boyd case, the California case. Bevilacqua? Yes. And the Court there said the principles as to certainty of the promise must be coordinated with the principles as to joint ventures, which require little formality in their creation and permit indefiniteness with respect to details. Not as to there has to be a meeting of the minds. And there has to be a meeting of the minds of the important issues. Here, Your Honor, and I think Judge Alsop distinguished the Bevilacqua case in the footnote. Here, Your Honor, we have the plaintiff for this purpose conceding that there was no contract. He conceded that at trial. There was no joint venture or no written contract. Well, we know there was no written contract. Yes. And it is acknowledged that you can have the fact that there's no written contract doesn't end it. We're not relying upon the fact simply that there was no written contract. But in this case, if you look and it's at SER and the record 011, there is a term sheet. And the term sheet in this case prepared by O'Melveny and Myers, the then counsel for CSI, said it very clearly. Before we can have an agreement to bid, it is subject to having in writing our financial arrangements decided. And the Bevilacqua case and these other cases make it very clear that when the parties themselves contemplate that there's going to be a writing, when they contemplate there will be a writing that is going to be signed and that's going to reflect the parties, then the courts are correct in looking at that and seeing if there was a writing. Their own document, this term sheet, makes it very clear, expressly clear, that in order to be in arrangement to bid, a condition precedent, if you will, is that the parties must have signed, must have had an executed agreement with regard to the advertising and finance. As I say, that's on page 011 of the supplemental excerpt of record. And it's very clear, Your Honors, that that was not the case here, that they never had an agreement in writing, that they were required to have an agreement in writing. We think that CCT is distinguishable, but again, if I may, Your Honors, the fact that the party conceded a trial that there was no contact. What precise language in the summary judgment proceedings and the opposition there to, are you relying on to say there was no oral joint venture agreement? They submitted a verified affidavit under oath that said that any agreement was subject to working out the details, subject to working out the details. And we know the details included the ownership issue and cause for termination. Judge Alstup cited that. Judge Alstup relied upon that. And he specifically distinguished CCT because in CCT, the parties had agreed to all the details. The fact that it wasn't in writing, that didn't matter because they had an agreement as to the oral details. Here, they had not agreed on the details. They had not agreed on the details. Judge Alstup found that, and there was no dispute as to that. But haven't they agreed to enter into a joint venture? They had entered, the record is clear, Judge Alicorn, from their own lawyer's documents, that before they would enter into a joint venture, this is in the term sheet, they had to have in writing, sign this agreement as to advertising and financing. And before they could enter into any bid, that was a requirement that they would have. And the best proof of that, it's like the puss in the pudding, is what the party said at trial. As to May 26, they could leave whenever they want. Well, they didn't try at trial the question of oral joint venture because the court didn't permit them. Indeed, that was not in the case. But his testimony, because his testimony was as clear as the bell. We had no contract. And this is the testimony of the president. Well, can we look at that in deciding whether the ruling on the summary judgment was correct? Your Honor, I don't... Why are we limited to what was presented to the court at the summary judgment proceedings? Your Honor, first of all, I think the record on the summary judgment proceeding is more than ample to uphold that. But in answer to your question, I would say not only can you look at it, but I respectfully submit the court would be blind to ignore a concession by a party asking this court to send the case back for trial on a breach of contract when under oath at trial, he admitted there was no contract. And you have a case to support that, that we can do that? You know, I thought you'd asked me that question, and I really looked. And this is a very... I can't find a case that goes either way on that point. And I think it is an unusual situation where summary judgment is granted as to a contract claim, and then at trial, the party testifies that there was no contract. But clearly, Your Honor, it's an admission against interest. Clearly, Your Honor, there should be a stop from having said there was no contract to now go back and say there was a contract. This was a free and open admission, but... Well, it sounds like things you could bring up at a future trial as to whether there was a joint venture. Well, only, of course, if there's a fact issue as to that issue. We believe that there was no fact issue and that Judge Alsop's opinion on that was correct. And if I may, I would like... I haven't had a chance to address the fraud issue, just for a moment. You know what I'd like to do? Yes, Your Honor. We've got enough time this morning. We're not going to make you guys sit down before you're finished. But let's hear from the other side, and I won't hold you to sort of a strict rebuttal something or other. You can talk about fraud when you get up afterwards. Thank you, sir. Okay. May it please the Court. My name is Nelson E. Brestoff, and I represent the Plaintiff City Solutions. Mr. Mason began by focusing on Judge Alsop's opinion having to do with the unfair competition claim, and I'd like to go there, too, because Mr. Mason has mischaracterized Judge Alsop when he talks about worry, because it really had to do with misusing the confidential information. That's what Judge Alsop said. And then he goes on to talk about other things that justify leaving in place the unfair competition award. The predicate for that is his discussion of a jury instruction, which is not claimed to be error, and which is jury instruction number 28. And that jury instruction, as he quotes it, covers both fraud and unfair competition damages. And in the opinion, he says that the jury instruction authorized an award for the amount which would reasonably, quote, reasonably and fairly compensate City Solutions for any damages caused by the defendant. The next sentence after that is, this order cannot say as a matter of law the jury's award was not supported by the record. So what has he said with respect to unfair competition? There was unfair competition, and that unfair competition caused damages. And you can recover any kind of damages for it. That was the instruction, and he went laboriously through the issue of whether you could recover lost profits or not. Now, lost profits can be recovered in this case for unfair competition in the amount of $800,000 because that's what the jury said. And the reason the jury didn't say lost profits, $800,000, it said $800,000. Correct. Yeah. The instruction was you can award any damages for any injury. And so the evidence of trial was all about lost profits. City Solutions put on its expert who said, well, look, there are two opinions here. In our opinion, the least amount is $11.6 million for just our 50% of the contract that was awarded back to Ad Shell as guaranteed by Eller. If you look at the terms that Ad Shell proposed, 450 news racks and ads on them with revenue sharing and the rest. It's higher if you look at what you proposed, namely 500 news rack. Let me add, before I lose this, I want to say this. OK. I have trouble reconciling on Judge Alsup's reasoning, his sustaining the $800,000 award on unfair competition and his striking down with the JNLV the fraud claim because he says you have no damages on your fraud claim because there was no way you were going to win this contract. And because there was no way you're going to win this contract, there are no lost profits, period. And you didn't ask for out-of-pockets, so you can't have those. I think that's what he says when he says, well, this is why you're not getting any damages on your fraud claim. Isn't that right? I would amend that idea, frankly. He does say that in the issue on the issue of fraud, that theory, the $9 million award, he doesn't see how we prove causation. Well, that's right. He doesn't say that there aren't any lost profits. But of course, because you can't show that you would have gotten the contract, necessarily there are going to be no lost profits because the only way you were going to get any profits was to win the contract. But that's his opinion, isn't it? Well, it definitely is his opinion. And he sets aside the jury's opinion. He says, as a matter of law, you were not going to win that contract, no matter what. Ah, but if you look at that, he doesn't say, no matter what. He says, had the scores been closer. And he says it twice. Of course, he said, had the scores been closer. But he says, there was no way those scores could have been closer based on this evidence. And that's why I'm giving the other side of JNOV on that point. This is just his opinion. This is him weighing the evidence in the way and making a conclusion that's beyond his province to make. Oh, I understand that. OK. But assuming that he's right on that for a moment, and I understand that's in question. But assuming he's right on that, that there was no way you were going to win that contract, how can it be that he can award lost profits on the $800,000 because, similarly, there's no way you're going to win the contract? Well, that is to say, the theory on the unfair competition is they go to school on you guys, they learn this information, and they get the contract they otherwise weren't going to get. Well, but he says, on the other part of the opinion, there was no way you guys were going to get the contract. I have trouble. In a sense, this isn't your fault. I just don't understand Judge Alsup. I don't understand Judge Alsup either. But the jury understood the evidence at the trial. And with respect to damages. Well, juries sometimes do and sometimes don't. They come out with a number. They come out with a number. But what I'm trying to get to is there were two experts who testified about lost profits damages. City Solutions put out one, and I was telling you about the levels for their two different contracts. Eller put on a lost profits damages expert, too, Mr. Anastasi, whose opinion was very different and who attacked the assumptions made by Dr. Marcus. And what Mr. Anastasi said was, well, I see a range here of lost profits, too, but it's a lost profits range of anywhere from $300,000 to the good to a minus $2.5 million. This is a loser contract if my lower number comes out. So what does the jury have in front of it? An expert who testifies that the lost profits range could be way down here. And another expert who's testifying that it's upwards of $10 million and more. With an instruction from the court, not objected to, no error claimed, that it's up to the jury to weigh the assumptions, weigh the battle of the experts, and come up for an answer. With respect to $800,000, neither expert said that number. Neither expert said the number $9 million. Neither expert said the number $9.8 million. All of those numbers are a function of what the jury thought. And there's another instruction and part of the verdict that says, please eliminate all duplication. So the jury put down $800,000 for unfair competition, $9 million for fraud. And when they were supposed to eliminate duplication, they wrote down, to eliminate, they added the two together and put down $9.8 million. So they made an allocation. Does that make sense? Yes, it does. The fraud was the prime mover here, wasn't it? It goes all the way back to the fact that on March 5th, a press release came out saying that AdShell was in play, that Eller's parent was in negotiations to buy AdShell. The RFP came out only a week later, March 12th. Sometime between March 12th and March 31st, when these parties first met, Mr. Broder, one of the Eller executives, wrote a little note that said, is this of interest vis-a-vis AdShell? And he wrote that note on the face page of the RFP. So Mr. Hooper had AdShell in his mind when he first met with Citi Solutions. And that's when he made what Judge Alsup wants to say as, characterize as, contractual promises that he can't enforce, which doesn't make sense.  He says, if we agree to do this at all, we'll do it with you and not with AdShell, if AdShell is subsequently acquired. Mr. Trento says he relies on that. The conversation wouldn't have continued on further had AdShell been a potential competitor and Eller had announced that maybe it was a potential competitor instead of a joint venture partner. Now, Eller still hasn't committed. So they have another meeting. At the second meeting, Mr. Trento gives them a confidentiality agreement. He signs that. Mr. Trento says at trial, I relied on that too. If he'd refused to sign the confidentiality agreement, we wouldn't have gone any further. But Mr. Hooper signed it. So then Mr. Hooper wanted to kick the tires and go look at the demonstration news racks. Mr. Mason says we have no experience. We were doing news racks in Florida before this. We were involved in the demonstration project. In this case, AdShell wasn't. Eller didn't. So after that, this is now April 13th, Mr. Hooper says, OK, we're in. And I'll commit the resources to actually working with you. This is like Holmes versus Lerner, where two women agree to go into the cosmetics business by having a kitchen table conversation. They don't even discuss how they're going to divide the profits. This is like Gunter versus Leff, another California case, a Supreme Court case, where the parties have telephone conversations about forming a joint venture to build the IRS service center in Fresno. So you can have joint ventures created by people shaking hands and going forward to do something together. We have much more than that in this case. They actually did it. They started writing things together. They started meeting things together. The briefs show that Eller sourced two potential subcontractors for City Solution for the combine. And on May 28th, they have what they call their economic summit, their economic package. And they decide, even though there's collegial debate, we're going to offer ads on 500 news racks and we're not going to propose revenue sharing. You said the 28th. Did you mean the 26th? No. May 28th is I'm sorry, April 28th. And then in the chronology on May 21st, Adchel is acquired. Eller's parent does acquire Adchel's parent. They never say anything to us. Then they have the Memorial Day weekend meeting where Mr. Hooper solicits Mr. Feinberg now that Adchel is their new corporate sister to bid and they'll be on their team. Then they have another meeting with us, the one on the 26th, and they don't say anything about Adchel. And they reaffirmed the promises that were made on March 13th that we'll bid with you if we do this at all. And we are and we won't bid with Adchel if it's later required. They said nothing about this. They don't tell us that we're off their team until June 3rd. The deadline is June 15th. So did we rely to our detriment? Of course. Help me out of this. You're arguing that there was an oral joint venture. When did that occur? It occurred on March. I want to say April 13th. Sorry, I misspoke before when I said March. It's April 13th, the third meeting after the first meeting when they got to know each other, after the confidentiality agreement was signed on April 3rd. They have a third meeting after they tour and look at the news racks. They go back to the Palace Hotel and they shake hands. And the next thing that happens is Eller sends its people to meet with Tom Trento and they start working out and write up a joint outline of their joint response. Mr. Trento, though, testified during trial that there was no contract until May 26th. Can we consider that in deciding whether the summary judgment should have been issued? If we're on to the summary judgment now, obviously, you have to look at what the evidence that you're relying on, then, that demonstrate there was an oral joint venture agreement. Well, it comes from several points.     But in particular, Mr. Hooper flat out said that after touring the demonstration news racks on Market Street at Palace Hotel on April 13th, he agreed to go forward with City Solutions as a bidding team and that Eller in particular was going to be the company handling the advertising. And then they actually behave that way. They actually go look for other subcontractors to be on their team and they start writing documents together and sharing information and having the economic summit where they come up with their bidding strategies. Now, what Judge Alsop does on the – what I'm trying to say to you about the fraud case, because obviously they don't want the $800,000 unfair competition award, I want the jury's verdict back on the $9 million, because what we really lost here were lost profits of millions of dollars, according to our expert, because obviously the jury believed him far more than their expert. What was your expert's top number again? The top number for our version of the contract was, I think, $13.4 million. For their version of the contract, which they actually got, so it's not speculative, was $11.6 million. We know that they got those profits on that contract. When you say their version of the contract is $11.6 million, that's factual information. We know that as a historical fact. It's not a historical fact, no. But the basis for his opinion was solid. All of these people did financial projections. Mr. Hooper did calculations. He did a spreadsheet. Mr. Hughes did one. Mr. Feinberg from AdShell did the most detailed of them all. Then, subsequent to this, City Solutions got a contract in Indianapolis, and all of that profitability information was available to the expert. And then Dr. Marcus also looked at what the ad rates for bus shelters in the Bay Area, the Eller charges. Boiled all that together, came up with a present value number. I believe it was $11.4 million. So 9.8 for that out of 11.4 is believing him to a very great extent. Now, if the jury chose to believe that $9 million of the damage was caused by Eller's fraud, there's nothing wrong with that, and $800,000 by the unfair competition, because the 800, the sharing of the information with AdShell didn't happen until at the end of the day. I'm willing to accept the $9 million for the purposes of argument right now. Okay. Judge Alsop rules against you on the fraud claim saying there was no way you were going to win that contract. That's to say, yeah, you were defrauded. I'm willing to go along with you on that one. But once you're no longer teamed up with Eller, you know, I looked at the bid you guys submitted. You were lower on these points. No way, period. How do you respond to that? There are so many ways to respond to that. Let me give you a laundry list. When he says that the scores were lopsided, he's weighing the evidence. Were they lopsided? No. He says there was a 76 point differential. Does he provide a context for that? No, it wasn't that 76 points out of 100. That would be a terrible loss. It was 76 points out of 500. So it's 15%. In other words, an 8% swing up for us and an 8% swing down for them. In other words, single digits. Yeah, but you're playing with the numbers a little bit, too, that is to say there was a $500 max. But what were the actual numbers that you got? What were the actual numbers they got? We got 466. Sorry. Sorry. They got 466. We got 390. That's the 76 point differential. So so we're talking about a differential of 466 is the top rather than rather than 500. But any of it. OK, I understand. Yeah, but they had 500 total possible points. I got it. Yeah. Atchell and Eller scored 466. City Solutions scored 390. Yeah. Now we came in second. Mr. Brugman testified he's the city's director of the NewsRack program. And what he said was if for some reason Atchell's bid had not been accepted or had been disqualified, we would have gone with City Solutions. They came in second. We would have done this contract with them. I've repeatedly heard them say, well, but it's all speculation. How do you know that the city would have even signed a contract with City Solutions? Or you would have been able to get all these various approvals for the contract? Atchell and Eller have been able to do that. They actually reached and negotiated a 20-year exclusive advertising contract with the city and county of San Francisco. That's in the record. And it's it's been amended. And it's still a live contract today. So if you accept the valuation, the next question is, was Judge Els, is there any substantial evidence in the record for the jury to believe that Eller's fraudulent concealments, which Judge Elsop does not discuss, and his what he says is a fraudulent promise, and he talks about it in the contractual sense and says it's been barred from the case, but there's nothing wrong with it being. And I'll point you right to that if you want. We must not hold Eller to its promise, for that would be an impermissible contract recovery previously barred in this case. He's thinking back about his summary judgment ruling. But this is an alternative approach to a contract. When you have fraud and it's a tougher case, and he made me prove it to 10 people unanimously, and we did, the fraudulent promises were we'll bid with you and not with Atchell, and we won't share information. So those promises should not have he should not have put up roadblocks like that. He should have understood those as being false statements. And then he wouldn't have had to would have been able to invoke his ruling on the contract. Now, I want to be clear about this. I'm not looking for a new trial here. Our client would like to have its jury verdict restored in full measure. That's what and there is substantial evidence in the record showing that these scores were a lot closer. Are you abandoning your appeal on the ruling on the summary judgment? I can't do that because I don't know what else you're going to do. But you kind of like your jury verdict. I kind of like my jury verdict. But I want to supply. So no, I'm not. But I do want to answer one other question. You say to us you don't want a new trial, and yet you ask for a trial on the contract. Let's let me be clear. If you were to agree with them that the $800,000 unfair competition award should be thrown out, I would not go back to trial on the claims I did not have an opportunity to present to a jury. That's fair. Well, we really can't negotiate with you. OK. There is a hallway out there for you guys. That you said that to both sides. But that's our position. But I want to make one other point just to make sure it comes through on the record. These scores were not lopsided. That's his. That's Judge Ossoff's characterization. If you take. I also have to say I've had a fair number of experience with these point things, not with respect to this particular contract. But, you know, you go in there and you kind of make your points. And by the time you're done, it looks very precise and scientific and so on. But there's a lot of gestalt that goes on. And I have to say my instinct isn't I'm kind of setting up for the rebuttal, if that's what I even call it at this point. A precision that comes out of these points and say, well, they lost by 30 points or 76 points or whatever, and therefore there was no way if you change a couple of things, those other points wouldn't have been. That's that to me is a spurious precision. It does not reflect what actually goes on in these point allocation things. And I it seems to me that the jury probably did have enough evidence in which it could have concluded, well, it was close enough. And maybe that maybe if these guys had not had the advantage of sitting down with these people knowing what they were going to do, they you know, they might have won the darn thing. Exactly. And I can add to that. Dan Brugman, the city's news director, testified that his instructions were, here's the RFP. Here are the responses. Here are the score sheets, which he realized he made up improperly because he didn't put some of the information in from the RFP to the score sheets. And he said, formulate your own opinions. Now, aesthetics and design is one of the categories. Beauty is in the eye of the beholder. This is street furniture. It's going to be out there for San Francisco to look at. And the whole point of it was the city doesn't like the fact that it has to look at street corners now with 6, 8, 10, 12 news racks cluttering it up. So you are dealing with something that's subjective. And the jury was entitled to understand which the evaluators did not know that Adshell had gone to school and Eller had gone to school on city solutions. What Judge Alsop says is to learn the news rack business. They got cost information from us. They got bidding strategies from us. So when the jury was looking at this, they were entitled to, this is not an unreasonable inference, if Eller had stayed away from Adshell, city solutions numbers would have been higher and Adshell's numbers would have been lower. And if you take the 466 and 390 and you just divide by a common factor to reduce it all down and you get a ratio, it turns out to be a 6 to 5 ratio. If this had been a nine inning ball game and they cheated on us at the last minute, we would have only lost 6 to 5, one run. That's close. That's not lopsided. The Judge Alsop sort of picked his way through the evidence to construct his argument and he left out a lot of evidence that was favorable to us and he certainly made characterizations. For him to even say, look at the strength of Eller, is Judge Alsop putting himself in the room with the evaluators and saying, and in the jury room and saying, this is how I would have decided the case. But if there's any substantial, I mean, the rules, which I don't think are even subject to the debate here, is that he's not to substitute his own view for that of the jury's. Okay. Well, you run over on purpose, I mean, on purpose from our side. We'll give the other side about three and a half minutes. Okay. Thank you. Your Honor, in filing the supplemental memorandum, CSI said the following to Judge Alsop that he relied upon, and I'm quoting from their brief. City Solutions was not hurt by having to bid with the two companies that replaced Eller, Foster Media and Jamison Codring.  That's CSI's statement.  That's CSI's statement. How about the converse? Did you get any advantage from your prior association with them? Your Honor, there were four categories of bidding. Four categories that they looked at. Of the ranking, yes? Only two of them were arguably involved. That's what Judge Alsop says. Well, they don't dispute that. They don't dispute it. And as to those two categories, he had approach and experience. One of those was outdoor experience and outdoor advertising. And the other one, this is aesthetics and design, was with respect to public service. But they have conceded. Not a question of taking anything away from a jury. They conceded they suffered no damages because of that. They don't say we were advantaged. If we were advantaged, they would have been injured. They concede they weren't injured. A concession by the plaintiff in the case. This is not something... When you say they conceded, are you relying on what you just read for the concession? I am relying upon, well, what they said in oral argument at the hearing. And on this memorandum they filed on January 9th. And could you read that to me again? Yes, Your Honor. Yeah, thanks. Citi Solutions was not hurt by having to bid with the two companies that replaced Eller, Gloucester Media and Jamison Cawdry. Citi Solutions suffered no damages by bidding with these replacement companies, pages 3 and 4 of their January 9th, 2003 memorandum submitted by Mr. Brestov's client. As Judge Alsop said, what this case is really about is they want to go back, and he just told you, back before May 26th to the contract. And they want to hold Eller to this alleged promise, which is disputed, but to this alleged promise that if we bid, we'll bid with you, we won't bid with Hatchell. But they've conceded. Which alleged promise was disputed? Whether there was a joint venture? Yes. No. No. I don't want to fall into that trap. No, Your Honor. What they're saying here, I'm giving you their argument. I'm not agreeing with it. This is their argument. Eller goes up to Mr. Trento, CSI's principal, and says, we're going to bid with you if we bid at all. We're not going to bid with anybody else. And they say, aha, but you wound up bidding with Eller. And you shouldn't have bid with Eller. Excuse me, you wound up bidding with Hatchell. Eller wound up bidding with Hatchell. And you shouldn't have bid with Hatchell. That's a breach of your promise. And that's why Judge Alsop say you're trying to hold them to the promise. What the record is, is that they can't hold us to the promise because of the summary judgment that was granted, which they conceded there was no contract now. I mean, Judge Alicorn asked counsel, well, do I have to deal with that? He didn't really answer it. But think about this, Your Honors. Just think about this, if I may respectfully ask you to do so. I have not been thinking all morning, but I'll begin now. No, I don't mean that, Your Honor. I shouldn't tease. I speak respectfully. No, no, I'm teasing, and I shouldn't. OK. What I'm saying, Your Honors, is the plaintiff is coming in to this court, having conceded at trial that there was no contract. Before May 26th. And now they say, oh, summary judgment ought to be granted. We ought to try that contract claim. They've conceded it. And that concession is not a big point, because look at the first amended verified complaint, which Judge Alsop cites in the summary judgment motion. In the first amended verified complaint, they said there was only one agreement, and that was on May 26th. That's an admission. A lawyer ought not to be able to file a verified complaint in a federal court, and then change it. Say that's not true. And that's what's happened here. That's why Judge- They don't do verified complaints in federal court. Well, they did. Well, actually, Your Honor, I think it was filed in state court, and it was removed. It was filed in state court and removed, but it was verified. But they're trying to say now that although we weren't damaged because Eller didn't bid with us, because they submitted this bid with Atchell, we didn't suffer damage because we had a replacement. Remember, Your Honor, they filed their report on June 3rd. They filed it on the due date. They asked for replacements for Eller. They said they could afford to fund it themselves. That's why they went to Eller. They're turning this into a contract case by saying, you promised you wouldn't do something, and now you did it. And, Judge Alicorn, you asked me about Bevilacqua. The case that I think is more important is a Ninth Circuit case called Rennick v. Option, and we cite that in a brief. It was a 1996 case. And in that case, there was an oral agreement, but then the Court looked at the subsequent letter of intent. Like we have here, we have this term sheet that I quoted to the Court, which counsel didn't discuss, didn't even mention. But as in the Rennick case by this Court in 1996, the parties' subsequent conduct made it clear that they contemplated that there would be a writing. This is not like the situation in CCT. The parties themselves contemplated a writing, and the writing was prepared by O'Melveny and Myers Counsel for CSI, not Eller, not Atschel. Their own lawyers contemplated this. And at the end of the document, it says, this is just a draft, and it's not going to work unless you sign it. Again, it's the E-O, excuse me, E-S-C-R-O-1-2. So when counsel comes in here and argues this so-called agreement on the 13th, in the brief, they said it was March 31st. Now they say it was April 13th. The fact of the matter is, if you look at this record, it's a Rennick-type situation. It's a Rennick-type situation because their own – the record shows that they contemplated a writing. I think we have the argument at hand. All right. Thanks, both sides. Thank you, Your Honors. We're done. The case of City Solutions versus Clear Channel Communications is now submitted for decision, and we will be in adjournment until tomorrow morning. Thank you very much. Thank you.
judges: Hug, Alarcon,w. Fletcher